[Cite as *Premium Beverage Supply, Ltd. v. TBK Prod. Works, Inc.*, 2016-Ohio-174.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Premium Beverage Supply, Ltd., | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 15AP-495 |
| v. | : | (C.P.C. No. 13CV-7076) |
| TBK Production Works, Inc. et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellants. | : | |

D E C I S I O N

Rendered on January 19, 2016

*Benesch Friedlander Coplan & Aronoff LLP*, *Roger L. Schantz* and *Steven A. Oldham*, for appellee.

*Henderson, Covington, Messenger, Newman & Thomas Co., L.P.A.*, *James L. Messenger*, *Richard J. Thomas* and *Jerry R. Krzys*, for appellants.

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendants-appellants, TBK Production Works, Inc. ("TBK"); The Brew Kettle Strongsville, LLC; The Brew Kettle Production Works, LLC ("Brew Kettle"); and The Brew Kettle Limited, LLC, appeal a judgment of the Franklin County Court of Common Pleas that granted summary judgment to plaintiff-appellee, Premium Beverage Supply, Limited ("Premium"). For the following reasons, we reverse that judgment and remand this matter to the trial court.

{¶ 2} In 1995, J. Christopher McKim opened a brew-on-premise microbrewery in Strongsville, Ohio. McKim gradually expanded his business to include a restaurant, winery, and production brewery. The production brewery, which TBK owned and

operated, manufactured craft beers.[1]  On December 19, 2008, TBK and Premium executed an agreement whereby TBK appointed Premium as the sole distributor of TBK's craft beers in most of Ohio.[2]   Premium distributed TBK's craft beers, generally without incident, until 2013.

{¶ 3}   In an asset purchase agreement dated January 30, 2013, TBK agreed to sell its assets to Brew Kettle.[3]  Brew Kettle is an Ohio limited liability company formed to own and operate the production brewery formally owned by TBK.  At the time of the asset purchase agreement, Rodney Davis owned a 32.1875 percent interest in Brew Kettle, Heather Russo owned a 32.1875 percent interest, McKim owned a 30 percent interest, and three other individuals owned an interest of 3 percent or less.[4]   On February 25, 2013, Brew Kettle (and the other buyers) paid the consideration required by the asset purchase agreement and the sale closed.

{¶ 4}   After the purchase of TBK's assets, Brew Kettle initiated the process to obtain an A-1c liquor permit from the Ohio Division of Liquor Control and approval of a brewer's notice from the federal Alcohol and Tobacco Tax and Trade Bureau ("TTB"). While waiting for the necessary licensing, Brew Kettle operated the production brewery pursuant to an interim management agreement.  In that agreement, TBK appointed Brew Kettle the manager of the production brewery so the brewery would not have to cease operations during the application period.

{¶ 5}   In a letter dated May 3, 2013, Brew Kettle notified Premium that, pursuant to R.C. 1333.85(D), it was terminating and/or not renewing the sales and distribution agreement between TBK and Premium.  In response, Premium filed suit against TBK.

---

[1]  McKim was TBK's president and the owner of 100 percent of TBK's stock.

[2]  The sales and distribution agreement excluded the location of The Brew Kettle restaurant from Premium's sales territory.

[3]  Actually, in the asset purchase agreement, the family of businesses established by McKim—including TBK; The Brew Kettle, Inc.; Your Wine Cellar, Inc.; and Erie Spirits, Inc.—sold their assets to a group of sellers, which consisted of Brew Kettle; The Brew Kettle Limited, LLC; and The Brew Kettle Strongsville, LLC.  This case concerns only the transfer of the assets of the production brewery.  Prior to the sale, TBK owned and operated the production brewery.  After the sale, Brew Kettle owned and operated the production brewery.

[4]  On July 29, 2013, the membership constituency of Brew Kettle changed, but McKim remained a member with a 30 percent interest.  In the reconstituted Brew Kettle, two other members, Rodney Davis and Christopher Russo, held interests slightly exceeding 30 percent.  All other members held de minimis interests.

Soon thereafter, Premium amended its complaint to add Brew Kettle as a defendant.[5] Premium alleged a claim for breach of contract, sought to enjoin Brew Kettle from cancelling Premium's distribution franchise, and requested a declaratory judgment stating that (1) Brew Kettle could not cancel Premium's franchise and (2) cancellation of the franchise constituted an unconstitutional taking. In an alternative claim, Premium requested that, in the event that the trial court found that Brew Kettle could cancel Premium's franchise under R.C. 1333.85(D), the court order Brew Kettle to compensate Premium as required by R.C. 1333.85 and 1333.851.

{¶ 6} In an agreed order dated July 19, 2013, the parties agreed to file cross motions for partial summary judgment focused on the determinative issue in the case; namely, whether Brew Kettle could terminate or decline to renew Premium's distribution franchise under R.C. 1333.85(D). Until the trial court ruled on those motions, Premium would continue to distribute Brew Kettle's craft beers.

{¶ 7} After considering the parties' cross motions for partial summary judgment, the trial court determined that Brew Kettle could not terminate Premium's franchise. Consequently, in a decision and entry dated November 14, 2013, the trial court granted Premium's motion for summary judgment and denied Brew Kettle's motion for summary judgment.

{¶ 8} Brew Kettle then filed what it called a supplemental motion for partial summary judgment and motion for reconsideration. In its combined motion, Brew Kettle explained that both the facts and the law had changed since the parties had moved for partial summary judgment. Of particular note, the Supreme Court of Ohio had decided a relevant case—*Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544. Additionally, Brew Kettle had received an A-1c liquor permit from the Division of Liquor Control,[6] and, upon receiving the permit, Brew Kettle had issued a second termination notice to Premium. Brew Kettle asserted in its motion that the trial

---

[5] The amended complaint also named The Brew Kettle Strongsville, LLC and The Brew Kettle Limited, LLC as defendants. The inclusion of these two defendants appears unnecessary, as Premium admits that neither were a party to or otherwise involved in its distribution franchise. We, therefore, will not refer to either defendant in our recounting of the procedural history of this case or our review of the assignments of error.

[6] At the time Brew Kettle moved for partial summary judgment, it had already received the TTB's approval of its brewer's notice. Receipt of the A-1c liquor permit completed the licensing Brew Kettle needed to legally manufacture and distribute its craft beers.

court should reconsider its decision in light of these new developments. The trial court did not find Brew Kettle's motion persuasive. In a decision and entry dated January 21, 2014, the trial court denied it.

{¶ 9} Brew Kettle appealed. We, however, dismissed the appeal because neither the November 14, 2013 judgment nor the January 21, 2014 judgment was a final, appealable order. *Premium Beverage Supply, Ltd. v. TBK Prod. Works, Inc.*, 10th Dist. No. 14AP-90, 2014-Ohio-4171, ¶ 18. We determined that, although the trial court granted Premium summary judgment on its claims for declaratory judgment, the trial court did not actually declare Premium's rights as requested in the amended complaint. *Id.* at ¶ 16. Without a statement of the rights and responsibilities of the parties involved, the judgments did not qualify as final, appealable orders.

{¶ 10} After we entered our decision, the trial court issued an entry, dated May 4, 2015, that declared that "Brew Kettle is not entitled to terminate or cause the termination of the [sic] Premium Beverage's franchise and Premium Beverage is entitled to continue distribution of Brew Kettle beers under the franchise terms as it has since 2009." (R. 162.) The trial court refused to make any declaration regarding constitutional rights, citing the well-settled practice of avoiding constitutional issues where a court can resolve a case on other grounds.

{¶ 11} Brew Kettle now appeals from the May 4, 2015 judgment, and it assigns the following errors:

> **Assignment of Error No. 1:** The trial court committed error as a matter of law in its November 14, 2013 Decision and Entry, its January 21, 2014 Decision and Entry, and its May 4, 2015 Entry Upon Remand by determining that The Brew Kettle Production Works, LLC was not a successor manufacturer under R.C. 1333.85(D).
>
> **Assignment of Error No. 2:** The trial court committed error as a matter of law in its November 14, 2013 Decision and Entry by determining that a purchaser of all or substantially all of an alcoholic beverage manufacturer's assets must be licensed by the State of Ohio, Department of Commerce, Division of Liquor Control before the purchaser may qualify as a successor manufacturer under R.C. 1333.85(D).
>
> **Assignment of Error No. 3:** The trial court committed error as a matter of law in its November 14, 2013 Decision and

Entry by determining that The Brew Kettle Production Works, LLC's acquisition of the selling manufacturer's assets did not close until The Brew Kettle Production Works, LLC received federal and state permits.

**Assignment of Error No. 4:** The trial court committed error as a matter of law in its November 14, 2013 Decision and Entry, its January 21, 2014 Decision and Entry, and its May 4, 2015 Entry Upon Remand by determining that a successor manufacturer must be a party to a pre-existing franchise agreement and may only terminate a pre-existing distributor pursuant to the franchise agreement, even if the franchise agreement's terms violate provisions of the Ohio Alcoholic Beverage Franchise Act, R.C. 1333.82 *et seq.*

**Assignment of Error No. 5:** The trial court committed error as a matter of law in its November 14, 2013 Decision and Entry, its January 21, 2014 Decision and Entry, and its May 4, 2015 Entry Upon Remand by failing to consider the Ohio Supreme Court's recent decision in *Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544, 3 N.E.3d 1173.

**Assignment of Error No. 6:** If the trial court was correct that The Brew Kettle Production Works, LLC's acquisition of the selling manufacturer's assets did not close until The Brew Kettle Production Works, LLC received federal and state permits, the trial court committed error as a matter of law in its January 21, 2014 Decision and Entry, and its May 4, 2015 Entry Upon Remand by determining that The Brew Kettle Production Works, LLC was not a successor manufacturer after The Brew Kettle Production Works, LLC had received federal and state permits.

**Assignment of Error No. 7:** The trial court committed error as a matter of law in its November 14, 2013 Decision and Entry and its January 21, 2014 Decision and Entry by determining that The Brew Kettle Production Works, LLC was not a successor manufacturer because the owner of 100 percent of the selling manufacturer's stock now owns a 30 percent membership interest in The Brew Kettle Production Works, LLC, especially when Premium did not raise a common control argument.

**Assignment of Error No. 8:** The trial court committed error as a matter of law in its November 14, 2013 Decision and Entry and its January 21, 2014 Decision and Entry by

disposing of the constitutional taking issue without addressing the merits of the issue, and committed error as a matter of law in its May 4, 2015 Entry Upon Remand by dismissing the constitutional taking issue under the constitutional avoidance doctrine based upon an erroneous interpretation of R.C. 1333.85(D), the franchise agreement between TBK Production Works, Inc. and Premium Beverage Supply, Ltd., and Ohio Supreme Court Precedent.

**Assignment of Error No. 9:** The trial court committed error as a matter of law in its January 21, 2014 Decision and Entry by determining that a trial court does not have the inherent authority to reconsider any decision until final judgment, and in determining that the Civil Rules do not authorize supplemental pleadings.

**Assignment of Error No. 10:** The trial court committed error as a matter of law in its May 4, 2015 Entry Upon Remand by granting a permanent injunction prohibiting Brew Kettle Production Works, LLC from terminating Premium Beverage Supply, Ltd.'s franchise to distribute craft beers, because Premium Beverage Supply, Ltd. did not demonstrate its right to such relief under applicable substantive law.

{¶ 12} We will begin our analysis with Brew Kettle's ninth assignment of error. By that assignment of error, Brew Kettle argues that the trial court erred in concluding that it lacked authority to rule on Brew Kettle's supplemental motion for partial summary judgment and motion for reconsideration. Brew Kettle misstates the trial court's conclusion. In fact, the trial court stated that no Ohio rule of civil procedure enables parties to file supplemental motions for summary judgment or motions for reconsideration. This statement is correct. Contrary to Brew Kettle's argument, Civ.R. 15(E) does not authorize supplemental motions for summary judgment. Civ.R. 15(E) permits the filing of supplemental pleadings. A motion for summary judgment is not a pleading. *State v. Wilkins*, 127 Ohio App.3d 306, 310 (2d Dist.1998); *O'Brien v. Citicorp Mtge., Inc.*, 10th Dist. No. 93AP-1074 (Feb. 24, 1995). Thus, motions for summary judgment fall outside of the auspices of Civ.R. 15(E).[7]

---

[7] Despite the omission of motions for reconsideration from the Ohio Rules of Civil Procedure, a party may move for reconsideration of an interlocutory decision at any time before the entry of final judgment. *Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, 10th Dist. No. 12AP-647, 2013-Ohio-3890, ¶ 27.

{¶ 13} Even if the trial court's conclusion were incorrect, Brew Kettle can show no prejudice. Despite the trial court's pronouncement, it considered and ruled on the merits of Brew Kettle's motion. Thus, even if Brew Kettle could establish error, that error is not a basis for reversal of the trial court's judgment. *Gill v. Grafton Corr. Inst.*, 10th Dist. No. 10AP-1094, 2011-Ohio-4251, ¶ 30 ("Absent any indication of material prejudice, error is harmless and cannot serve as a basis for reversal."). Accordingly, we overrule Brew Kettle's ninth assignment of error.

{¶ 14} By the remaining assignments of error, Brew Kettle challenges the trial court's decision to deny it summary judgment and grant summary judgment to Premium. A trial court will grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 15} The resolution of Brew Kettle's first through seventh and tenth assignments of error turns upon whether R.C. 1333.85(D) permitted Brew Kettle to terminate and/or not renew Premium's distribution franchise. R.C. 1333.85(D) is part of the Ohio Alcoholic Beverage Franchise Act, R.C. 1333.82 et seq., which governs the franchise relationships between manufacturers and distributors of alcoholic beverages. The General Assembly created the Act to eliminate unfair practices by alcoholic beverage manufacturers in their dealings with distributors. *Esber Beverage*, 138 Ohio St.3d 71, 2013-Ohio-4544, at ¶ 10.

{¶ 16} Under the Act, as a general rule, a manufacturer cannot cancel or fail to renew a distribution franchise without prior consent unless just cause exists and 60 days' prior notice is provided. R.C. 1333.85. Division (A) of R.C. 1333.85 lists three events that constitute just cause: (1) voluntary bankruptcy, (2) involuntary bankruptcy, or (3) the loss

of liquor permits. Division (B) of R.C. 1333.85 lists four events that do not constitute just cause: (1) the failure or refusal of a party to take an action that would result in a violation of federal or state law; (2) the restructuring, other than in bankruptcy, of a manufacturer's business; (3) the unilateral alteration of the franchise by a manufacturer for a reason unrelated to any breach of the franchise or violation of R.C. 1333.82 to 1333.86 by the distributor; and (4) "[a] manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control."

{¶ 17} Division (D) of R.C. 1333.85 is an exception to the general rule requiring just cause to terminate a franchise. Pursuant to R.C. 1333.85(D):

> If a successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer, the successor manufacturer, within ninety days of the date of the merger, acquisition, purchase, or assignment, may give written notice of termination, nonrenewal, or renewal of the franchise to a distributor of the acquired product or brand.

If a distributor does not receive a notice of termination or nonrenewal within 90 days of the merger, acquisition, purchase, or assignment, then a franchise relationship is established between the distributor and the successor manufacturer by operation of law. *Id.* On the other hand, if the successor manufacturer properly terminates or fails to renew a franchise, the franchise ends. The distributor, however, is not without a remedy. If the successor manufacturer terminates or fails to renew the franchise, the successor manufacturer must repurchase the distributor's inventory of the terminated or nonrenewed product or brand and "compensate the distributor for the diminished value of the distributor's business that is directly related to the sale of the product or brand terminated or not renewed by the successor manufacturer." *Id.*

{¶ 18} Here, the trial court set forth two reasons for concluding that Brew Kettle could not terminate Premium's distribution franchise. First, the trial court found that the terms of the sales and distribution agreement—not R.C. 1333.85(D)—controlled when and how the franchise could be terminated. Brew Kettle could not terminate the sales and distribution agreement because: (1) it was not a party to that agreement, and (2) the

agreement did not include a term allowing for its termination if a successor manufacturer acquired all or substantially all of the assets of TBK. Second, the trial court concluded that, even if R.C. 1333.85(D) applied, Brew Kettle did not qualify as a "successor manufacturer." Consequently, R.C. 1333.85(D) did not provide Brew Kettle with authority to terminate Premium's distribution franchise.

{¶ 19} On appeal, Premium offers no rebuttal to Brew Kettle's attack on the first reason for the trial court's decision. Premium has abandoned its agreement-centric argument—which the trial court adopted—in light of the Supreme Court of Ohio's decision in *Esber Beverage*. In that case, the Supreme Court concluded that the existence of a written franchise agreement did not bar a successor manufacturer from relying on R.C. 1333.85(D) to terminate the franchise. In relevant part, the court held:

> Allowing a successor manufacturer to terminate a written franchise agreement without cause is clearly permitted under R.C. 1333.85(D), as long as the successor manufacturer provides written notice of the termination to the distributor within 90 days of the sale, merger, or acquisition, and as long as compensation for the lost value of the franchise is provided. Moreover, pursuant to statute, the parties are unable to restrict this right of termination by contract—under R.C. 1333.83, "[a]ny provision of a franchise agreement that waives any of the prohibitions of, or fails to comply with, sections 1333.82 to 1333.87 of the Revised Code is void and unenforceable."

*Esber Beverage*, 138 Ohio St.3d 71, 2013-Ohio-4544, at ¶ 14. Given this holding, we conclude that the trial court erred in finding that Brew Kettle's non-party status and lack of compliance with the terms of the sales and distribution agreement precluded Brew Kettle from terminating Premium's franchise.

{¶ 20} Having rejected the trial court's first reason for granting Premium summary judgment, we turn to the second: Brew Kettle was not a "successor manufacturer." Nothing in the Ohio Alcoholic Beverage Franchise Act defines the term "successor manufacturer." The Act, however, does set forth the meaning of "manufacturer." As used in the Act, a "manufacturer" is "a person, whether located in this state or elsewhere, that manufactures or supplies alcoholic beverages to distributors in this state." R.C. 1333.82(B).

{¶ 21} Premium contests Brew Kettle's ability to meet the statutory definition of "manufacturer," much less qualify as a "successor manufacturer." Premium first argues that, when Brew Kettle sent the May 3, 2013 termination notice, Brew Kettle was not a manufacturer because it did not yet possess the necessary permits to legally manufacture alcoholic beverages in Ohio. Premium contends that, due to Brew Kettle's inability to qualify as a manufacturer on May 3, 2013, the notice sent on that date could not effectuate the termination of Premium's franchise.

{¶ 22} R.C. 1333.82(B) does not state that a person must possess the appropriate licensing in order to be a manufacturer. Thus, to find in Premium's favor, we would have to read a licensing requirement into the statute. Courts, however, must give effect to the words used in a statute, not delete words used or insert words not used. *Zumwalde v. Madeira & Indian Hill Joint Fire Dist.*, 128 Ohio St.3d 492, 2011-Ohio-1603, ¶ 24; *Sarmiento v. Grange Mut. Cas. Co.*, 106 Ohio St.3d 403, 2005-Ohio-5410, ¶ 29. If the General Assembly could have used a particular word in a statute but did not, a court cannot add that word by judicial fiat. *Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 142 Ohio St.3d 236, 2014-Ohio-5511, ¶ 26. Consequently, we reject Premium's construction of R.C. 1333.82(B).

{¶ 23} Premium does not dispute that Brew Kettle was manufacturing alcoholic beverages pursuant to the interim management agreement when it sent the May 3, 2013 termination notice. Brew Kettle thus qualified as a manufacturer under R.C. 1333.82(B) when it notified Premium that it was terminating Premium's distribution franchise.

{¶ 24} Next, Premium switches its emphasis to the "successor" portion of "successor manufacturer." Brew Kettle maintains that a "successor" is "one who follows or comes into the place of another." *See Bank One Ohio Trust Co. v. Hiram College*, 115 Ohio App.3d 159, 161 (7th Dist.1996). Premium contends that, under that definition, Brew Kettle could not become TBK's successor until the asset purchase transaction was consummated. Premium contends that Brew Kettle's acquisition of the necessary licensing was a precondition to the consummation of the transaction. Thus, according to Premium, Brew Kettle did not acquire TBK's assets on February 25, 2013, when the asset purchase transaction closed, but instead Brew Kettle acquired the assets on October 31, 2013 when it received its A-1c liquor permit. Premium, therefore, maintains that Brew

Kettle was not a successor manufacturer when it sent the May 3, 2013 termination notice, making that notice invalid.

{¶ 25} Premium relies on Section 5.1(a) of the asset purchase agreement to support its argument that parties conditioned the consummation of their agreement on Brew Kettle securing the appropriate licensing. Section 5.1(a) states:

> Each of the parties hereto shall, and shall cause each of its affiliates to, use its reasonable efforts to (i) obtain at the earliest practicable date and, in any event, before the Closing Date,[8] any approvals, authorizations and consents necessary to consummate the transactions contemplated by this Agreement, including without limitation the required consents of alcoholic beverage agencies (the "Liquor Consents").

{¶ 26} Premium, however, ignores Sections 6 and 7 of the asset purchase agreement. In relevant part, Section 6 provides:

> CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction on or before the Closing Date of each of the following conditions:
>
> * * *
>
> 6.3 CONSENTS. * * * The Seller and Purchaser, and their counsel if necessary, shall undertake to have a meeting or conference call with the liquor control authorities to confirm that there are no major impediments or obstacles to transfer and/or approval of the Purchaser, and recap Seller's previous conversations with the authorities to [sic] regarding these issues.

In relevant part, Section 7 states:

> CONDITIONS PRECEDENT TO OBLIGATIONS OF THE PURCHASER. Except as may be waived by Purchaser, the obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the

---

[8] With regard to the closing, the asset purchase agreement provides in Section 2, "A closing ('the Closing') to effect the purchase and sale of the Purchased Assets shall be held * * * on such date (the 'Closing Date') as may be mutually agreed upon by the parties. At the Closing, Seller and Purchaser shall execute such bills of sale and instruments of assignment and assumption as are necessary to convey title to the Purchased Assets and to constitute assignment and assumption of the Assumed Liabilities, and Purchaser shall pay to Seller, in immediately available funds, an amount equal to the Purchase Price."

> satisfaction, on or before the Closing Date, of each of the following conditions:
>
> * * *
>
> 7.3 CONSENTS. * * * Purchaser shall take all actions necessary to obtain all Liquor Consents and/or alcohol permits as soon as practicable given the governmental administrative process.

{¶ 27} Reading all the pertinent sections together, we conclude that the asset purchase agreement contains ambiguity regarding whether Brew Kettle had to actually obtain the necessary liquor licensing before the closing. Section 5.1(a) suggests that receipt of the licensing constituted a precondition to the consummation of the sale. However, Sections 6.3 and 7.3 only require that, prior to the closing, the parties to take steps to assure that licensing will be forthcoming. To resolve this ambiguity, we turn to extrinsic evidence. *See Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 12 ("[W]here a contract is ambiguous, a court may consider evidence to ascertain the parties' intent.").

{¶ 28} In his deposition, Rodney Davis, who negotiated the asset purchase agreement for Brew Kettle, explained that the parties initially thought that Brew Kettle could secure the necessary licensing prior to closing, but then discovered that it could not. When confronted with Section 5.1(a), Davis acknowledged its import, but then stated, "I guess that language aside, we knew that -- there was going to be no consent we could get [prior to the closing]. I think [when Section 5.1(a) was] crafted we were trying to transfer a permit, and at that time we were told you could not transfer a permit." (Davis deposition at 58.) Davis and Premium's attorney then engaged in the following colloquy:

> [Davis]: So I'm not aware of any scenario by which [Brew Kettle] could have gone in and gotten approved, and then done the asset purchase agreement, and then closed the transaction.
>
> [Premium's attorney]: And I think we're on the same page. And that's why I was surprised to see in section 5.1 A, romanette 1, that the parties obtain[ ] at the earliest possible date any approvals, authorizations -- and it goes on to say the required liquor consents.

[Davis]: Like I told you before, this is the first time we've been done this road. * * * [T]his is the first brewery I've ever bought. We didn't realize that would be an issue.

(Davis deposition at 59-60.)

{¶ 29} Given Davis' testimony, reasonable minds could only conclude that Section 5.1(a) is a vestige of the parties' original intent that Brew Kettle obtain the necessary licensing prior to closing. Sections 6.3 and 7.3 set forth the actual preconditions the parties agreed to after they realized that their original plan was not feasible. Brew Kettle, therefore, did not have to acquire the necessary licensing for the asset purchase transaction to become final. The parties consummated the transaction at the February 25, 2013 closing when Brew Kettle paid the agreed-upon consideration and became owner of the majority of TBK's assets. Consequently, we reject Premium's argument that Brew Kettle was not TBK's successor as of the date of the May 3, 2013 termination notice.[9]

{¶ 30} Premium next argues that Brew Kettle was not a successor manufacturer because McKim controlled both TBK and Brew Kettle.[10] To review this argument, we must delve into the interaction between divisions (B) and (D) of R.C. 1333.85.

{¶ 31} As we stated above, normally, a manufacturer must have just cause to terminate a distributor's franchise. R.C. 1333.85(D) provides an exception to the rule requiring just cause. Just cause to terminate is not needed if a "successor manufacturer acquires all or substantially all of the stock or assets of another manufacturer through merger or acquisition or acquires or is the assignee of a particular product or brand of alcoholic beverage from another manufacturer." *Id.*

---

[9] For the sake of completeness, we will note that Premium makes much of the fact that the interim management agreement states that it will terminate "on the final closing date," i.e., the date on which Brew Kettle receives the necessary licensing. The asset purchase agreement does not include any mention of a "final closing date," much less delay the transfer of the assets to that date. Therefore, the use of the phrase "final closing date" has no bearing on determining the date on which the parties consummated the asset purchase agreement.

[10] Brew Kettle argues that Premium waived this argument by not raising it before the trial court. While we would normally decline to decide a waived issue, we find that the common-control issue was properly before the trial court because Brew Kettle raised it in its motion for partial summary judgment. Therefore, we will consider the merits of the argument.

{¶ 32} The R.C. 1333.85(D) exception must be interpreted in light of R.C. 1333.85(B)(2), which states that "[t]he restructuring * * * of a manufacturer's business organization" is *not* just cause to terminate a franchise, and R.C. 1333.85(B)(4), which states that "[a] manufacturer's sale, assignment, or other transfer of the manufacturer's product or brand to another manufacturer over which it exercises control" is *not* just cause to terminate a franchise. R.C. 1333.85(B)(2) and 1333.85(B)(4) "demonstrate a clear legislative intent to deny manufacturers the ability to terminate franchises due to corporate reorganizations or the shifting of brands among entities under common control." *Inbev USA LLC v. Hill Distrib. Co.*, S.D.Ohio No. 2:05-cv-00298 (Apr. 3, 2006); *accord Beverage Distribs., Inc. v. Miller Brewing Co.*, 690 F.3d 788, 794 (6th Cir.2012); *Superior Beverage Co. v. Shieffelin & Co.*, N.D.Ohio No. 1:05 CV 0834 (Sep. 20, 2007); *Esber Beverage Co. v. Inbev USA, LLC*, 5th Dist. No. 2006CA00113, 2007-Ohio-927, ¶ 56. R.C. 1333.85(D) must be read in the context of the statute as a whole in order to avoid allowing conduct under division (D) that is prohibited under division (B). Thus, to fit within the R.C. 1333.85(D) exception, a manufacturer must show that neither R.C. 1333.85(B)(2) nor R.C. 1333.85(B)(4) apply. *Hill Distrib. Co. v. St. Killian Importing Co.*, S.D.Ohio No. 2:11-CV-706 (Sept. 7, 2011).

{¶ 33} In the case at bar, Premium contends that the asset purchase transaction falls within R.C. 1333.85(B)(4) because McKim exercised control over both TBK and Brew Kettle. The Ohio Alcoholic Beverage Franchise Act does not define what constitutes the exercise of control. We, however, find direction regarding that meaning in the protective purpose of the Act. As the Supreme Court of Ohio recently recognized, the Act was intended to eliminate unfair practices by alcoholic beverage manufacturers in their dealings with distributors. *Esber Beverage*, 138 Ohio St.3d 71, 2013-Ohio-4544, at ¶ 10. The Act:

> recognizes that distributors often have a substantial investment in their businesses, including the physical assets and real property used to distribute the manufacturers' products, and that to allow a manufacturer unilaterally to terminate a franchise agreement puts the franchise distributors at great risk of harm. The just cause requirement for terminating a franchise agreement is intended to protect the franchisee from this type of arbitrary and potentially coercive act.

*Beverage Distribs., Inc. v. Miller Brewing Co.*, S.D.Ohio No. 2:08-cv-827 (June 2, 2009).

{¶ 34} To fulfill the protective purpose of the Act, courts must conduct an expansive, thorough review to determine if the prior manufacturer "exercises control" over the subsequent manufacturer. In determining whether common control exists, a court should examine the totality of the circumstances. *Beverage Distribs., Inc. v. Miller Brewing Co.*, 803 F.Supp.2d 765, 777 (S.D.Ohio 2011). A court must ensure that a manufacturer has not simply set up a new entity that, on paper, appears separate from its predecessor, but, in reality, is under the control of the predecessor. *Beverage Distribs., Inc. v. Miller Brewing Co.*, S.D.Ohio No. 2:08-cv-827 (June 2, 2009).

{¶ 35} Here, there is no evidence that Brew Kettle's purchase of TBK's assets was merely a "paper" transaction. The parties entered into arms-length negotiations, which culminated in Brew Kettle's payment of consideration in exchange for all of TBK's assets, aside from non-transferable liquor permits.

{¶ 36} Prior to the transaction, McKim undisputedly had control of TBK. McKim held 100 percent of the stock of TBK and acted as TBK's president. In contrast, McKim held a 30 percent interest in Brew Kettle and was one of Brew Kettle's multiple members. Section 9.1 of Brew Kettle's operating agreement invested all the members of the company with the responsibility for managing Brew Kettle's operations. All actions of the membership required an affirmative vote of a majority interest. Additionally, under Section 9.3 of the operating agreement, Christopher Russo was "the operations manager responsible for the day to day operations of [Brew Kettle] and authorized to make any and all decisions customary and reasonable for furtherance" of the business, with certain exceptions which required the vote of the membership.

{¶ 37} Despite McKim's minority interest in Brew Kettle, Premium contends that, in reality, McKim controlled Brew Kettle's operations. Premium offers two facts to support this contention. First, Premium points to the fact that the asset purchase agreement barred McKim from competing with Brew Kettle for a period of five years after ending his relationship with it. While the existence of this contractual term signals McKim's importance to Brew Kettle, it does not provide any insight to whether McKim controlled Brew Kettle. Second, Premium directs this court to the fact that McKim, Rodney Davis, and Christopher Russo discussed, and ultimately decided, to terminate

Premium's franchise. Far from proving McKim's control, this fact shows that McKim was only one of multiple individuals with a voice in Brew Kettle's actions. McKim played a role in Brew Kettle's management, but no reasonable finder of fact could conclude that he controlled the business.

{¶ 38} In sum, we reject all of Premium's arguments that Brew Kettle did not qualify as a "successor manufacturer" under R.C. 1333.85(D). Brew Kettle presented evidence that it acquired substantially all of TBK's assets on February 25, 2013. Brew Kettle gave Premium written notice that it was terminating and/or not renewing Premium's distribution franchise on May 3, 2013—within 90 days of Brew Kettle's acquisition of TBK's assets. Thus, pursuant to R.C. 1333.85(D), Brew Kettle legally cancelled Premium's franchise on May 3, 2013.

{¶ 39} Based on the above holding, we sustain Brew Kettle's first, second, third, fourth, fifth, seventh, and tenth assignments of error. Our ruling on the third assignment of error renders the sixth assignment of error moot, so we do not decide it.

{¶ 40} Only the eighth assignment of error remains for consideration. By that assignment of error, Brew Kettle argues that the application of R.C. 1333.85(D) does not result in an unconstitutional taking.

{¶ 41} Rather than address the merits of Brew Kettle's argument, Premium contends that we should remand this case so that the trial court can determine the takings issue. We refuse to do that. The trial court granted Premium summary judgment on the claim seeking a declaratory judgment regarding the alleged taking. Even though the trial court ultimately decided not to declare Premium's constitutional rights, a ruling in Premium's favor on the takings claim remains. That ruling is now on appeal, and we must address whether it constituted error.

{¶ 42} Before the trial court, Premium argued that the use of R.C. 1333.85(D) to terminate its distribution franchise effectuated a state-sanctioned appropriation for private, not public, use. Both the federal and state constitutions forbid the government from taking private property for the sole benefit of a private individual. *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, ¶ 43. Thus, Premium contended, Brew Kettle's use of R.C. 1333.85(D) violated both the United States and Ohio Constitutions.

{¶ 43} Premium's argument erroneously assumes that a taking has occurred. However, "[s]imply because legislative action impacts a private action does not mean there is a taking." *Tri Cty. Wholesale Distribs., Inc. v. Labatt USA Operating Co., LLC*, S.D.Ohio No. 2:13-cv-317 (Jan. 6, 2014). If "property is *taken* for public use the government is liable; but if [property is] injured or destroyed by lawful action, without a taking, the government is not liable." (Emphasis sic.) *Omnia Commercial Co. v. U.S.*, 261 U.S. 502, 510 (1923). Relying on *Omnia*, the United States District Court for the Southern District of Ohio concluded that no taking occurs when a private party employs R.C. 1333.85(D) to terminate a distributor's franchise agreement. *Tri Cty. Wholesale Distribs., Inc.* We agree with that conclusion. Accordingly, we sustain the eighth assignment of error.

{¶ 44} For the foregoing reasons, we sustain defendants-appellants' first, second, third, fourth, fifth, seven, eighth, and tenth assignments of error, and we overrule defendants-appellants' ninth assignment of error. Our ruling on the third assignment of error renders moot defendants-appellants' sixth assignment of error. We reverse the judgment of the Franklin County Court of Common Pleas, and we remand this matter to that court so that it may grant defendants-appellants summary judgment on the first through fourth claims. Additionally, because our ruling revives the claim for compensation due to termination of the distribution franchise, the trial court must conduct proceedings to determine that claim.

*Judgment reversed; cause remanded with instructions.*

TYACK and DORRIAN, JJ., concur.

———————